■ Bestolife Corporation et al., Appellants, v American Amicable Life et al., Defendants, and The Chase Manhattan Bank et al., Respondents. [774 NYS2d 18]—

Order, Supreme Court, New York County (Karla Moskowitz, J.), entered June 19, 2002, which, to the extent appealed from as limited by the briefs, granted defendants' motion to dismiss causes of action sounding in breach of fiduciary duty, professional negligence, breach of a duty of due care, tortious interference, disgorgement, violation of the Federal Bank Holding Company Anti-Tying Act and breach of an advisory agreement between plaintiff Quexco, Inc. and defendant Chase Securities, Inc., unanimously modified, on the law, to reinstate plaintiffs' claims for breach of the advisory agreement, breach of fiduciary duty, professional negligence, tortious interference and disgorgement, and otherwise affirmed, without costs.

This litigation involves two related actions that arise from complex investment and financing arrangements. Action No. 1, the Bestolife litigation, is presently before us. Plaintiffs are borrowers and guarantors on various debts and defendants are lenders and note holders relating to that debt. Plaintiffs are a group of related companies engaged in the business of recycling batteries and smelting and refining various metals. Plaintiff RSR is itself a group of companies, which includes the parent holding company Quexco, Inc. The business relationship between borrower and lender was well established, dating to 1971 when RSR and Chemical Bank, Chase's predecessor, had commenced a business relationship. Chase had since become RSR's principal banker. RSR utilized Chase's wide range of services,

especially with regard to its various acquisitions over the years. In view of the fluctuating economics of the commodities markets in which plaintiffs were involved, the reliability of these services and especially the use of revolving lines of credit and other financing devices were critically important.

Two different financial agreements and one professional service agreement are in issue in this case. In 1996, RSR as principal borrower, Quexco the parent company as guarantor, and other plaintiffs entered into a Credit Agreement with Chase and defendant Wells Fargo for a revolving line of credit in the amount of $25 million, due in December 2001. This line of credit resulted in part from a renegotiation of an existing 1992 loan. The 1996 line of credit was governed by a Credit Agreement. Plaintiffs contend that the Credit Agreement was fairly standard, with standard technical covenants and other provisions that, historically, had been waived or modified by Chase to accommodate fluctuations in plaintiffs' markets, acquisitions by RSR, or even occasional fluctuations in RSR's financial position. RSR and other plaintiffs at that time also redeemed existing notes and other debt relating to the 1992 financing, which were replaced with two new issues of notes totaling $75 million. Chase was the placement agent for these notes. Chase placed the notes with certain other defendant note holders pursuant to a Note Agreement. The Credit Agreement and Note Agreement were separate agreements, yet they interrelated in certain manners.

The Credit Agreement required plaintiffs to maintain specified net worth levels, leverage ratios and fixed charge coverage ratios as security for credit extended thereunder. The Credit Agreement also provided that if these financial security covenants were breached, that failure would constitute a default of the Credit Agreement. Plaintiffs' right to draw against the line of credit was contingent on plaintiffs being in compliance with the Credit Agreement. The Credit Agreement also provided that it could not be modified except in writing, nor would the bank's failure or delay in exercising any rights thereunder constitute a waiver of its contractual rights. In the underlying lawsuit, the parties dispute whether verbal assurances, against a background of a history of customary business practices among the parties, can be an effective waiver.

In 1997, plaintiff RSR/Quexco negotiated with Pacific Dunlop Holdings and its subsidiary, GNB Technologies, to purchase certain assets relating to battery and metal operations. Apparently, Dunlop was plaintiffs' competitor, and a downturn in the lead market at that time made the purchase seem advanta-

geous. However, in view of that declining market, and the transaction's costs, the purchase was likely to financially restrict plaintiffs' net worth, cash flow, leverage and other finances. That fact has relevance to the financial security that was required by the Credit Agreement. Plaintiffs allege that they kept in close contact with Chase regarding the GNB transaction, and plaintiffs' concerns, and that a Chase official had verbally agreed to waive the covenant's security conditions should that be necessary to accommodate the purchase.

For the proposed GNB purchase, plaintiffs retained defendant CSI, which was Chase's investment banking operation, as a financial advisor and to broker the deal. Plaintiffs entered a letter agreement in July 1998 with CSI outlining the terms of the services CSI would provide. This Advisory Agreement provided that CSI would basically investigate whether the GNB purchase was desirable and feasible. If RSR/Quexco elected to proceed, CSI would participate with RSR/Quexco in devising a strategy, recommend pricing and terms relating to the purchase, participate in purchase negotiations upon Quexco's request, and, again upon request, introduce RSR/Quexco to potential partners who might participate in the purchase. However, the Advisory Agreement stated that CSI was not acting as RSR/Quexco's private placement agent in this regard. Moreover, RSR/Quexco acknowledged in the Advisory Agreement that CSI would not be making an independent appraisal of RSR/Quexco's assets or of GNB's divisions, and that RSR/Quexco alone would be "responsible for making its own independent assessment of the risks, benefits and suitability" of the transaction. In a subsequent commitment letter, CSI agreed to act as RSR/Quexco's exclusive agent in placing financing for the proposed purchase, and Chase agreed to be principally involved in the financing. Although CSI and Chase were technically distinct entities, plaintiffs allege that they actually worked closely together on this transaction. Plaintiffs note that Chase had earned significant sums from plaintiffs in past transactions and allege that it would likely earn millions of dollars in fees if the GNB transaction were consummated. Plaintiffs allege that throughout this process they relied extensively on CSI and Chase for advice regarding the continuing desirability and feasibility of the GNB transaction.

In July 1998, RSR/Quexco entered into an acquisition agreement with Pacific Dunlop for the purchase of GNB. In this connection, plaintiffs incurred significant acquisition-related costs. Plaintiffs allege that they provided regular financial statements to Chase, in connection with the Credit Agreement, that showed

that plaintiffs intended to use the line of credit to pay for the transaction costs and to write off those expenses if the transaction did not close. Also, plaintiffs anticipated using certain assets to pay transaction costs. Plaintiffs were concerned that without the availability of this funding, writing off the acquisition costs might place them in default under the Credit Agreement with Chase. Plaintiffs allege that Chase assured them of continued support, that it agreed to modify the necessary covenants in the Credit Agreement in this regard as Chase often had done in the past, and that access to credit would not be affected by the GNB transaction costs. However, plaintiffs also allege that Chase and defendant Wells Fargo actually began scrutinizing plaintiffs' operations, while at the same time Chase and CSI aggressively encouraged the GNB purchase so as to secure their fees. Plaintiffs claim that they were reconsidering that purchase in view of economic data indicating that GNB was not meeting its projections and was overpriced. They also allege that at the same time, Chase was applying coercive pressure to ensure that the deal closed. In April 1999, plaintiffs, Chase and Wells Fargo modified the Credit Agreement, with plaintiffs reminding the lenders that if the transaction did not close, they would have to write off the transaction expenses and that Chase had assured plaintiffs that they would waive rights under the financial covenants in this regard. Plaintiffs also allegedly advised Chase that they were relying on the line of credit in order to make a $4 million payment due the holders of the notes. Plaintiffs had not succeeded in modifying the agreement with the note holders. However, Chase allegedly advised the note holders at a meeting in early June 1999 that RSR/Quexco would be able to access the line of credit in order to make the December 1999 payment.

In mid-June 1999, RSR/Quexco terminated its purchase of GNB and wrote off $6.5 million in transaction costs. Shortly thereafter, Chase notified plaintiffs that they were in default and froze the line of credit. However, plaintiffs observe that Chase did not claim that the termination of the deal directly contravened the Credit Agreement but, rather, that Chase informed them that this action had placed plaintiffs in default to the note holders, which then triggered a default under the Credit Agreement. Plaintiffs allege that when Chase froze the line of credit, they had insufficient funds to make the $4 million payment to the note holders, which necessarily would have placed them in default and, as a consequence, they were forced to renegotiate the debt, resulting in additional fees and interest.

Plaintiffs commenced the present action. Defendants moved

to dismiss plaintiffs' causes of action. The IAS court dismissed several causes of action, which plaintiffs appeal in part.

In relevant part, the court dismissed the claim that Chase and CSI breached the Advisory Agreement. Dismissal with regard to Chase, which was not a party to that agreement, is not challenged on appeal. Regarding CSI, the court ruled that the provision in the Advisory Agreement reposing ultimate decision making in RSR/Quexco and stating that CSI was not providing an independent appraisal defeated this breach of contract claim. However, bearing in mind the alleged close relationship between Chase and CSI, the broad language of that agreement, requiring CSI to advise RSR/Quexco as to the desirability of the GNB transaction, provides a basis for the claim that CSI had failed to advise plaintiffs that Chase would freeze the credit line if the transaction did not close (*Leather v United States Trust Co. of N.Y.*, 279 AD2d 311 [2001]; *Scalp & Blade v Advest, Inc.*, 281 AD2d 882 [2001]) and that CSI was aware of this adverse financial consequence (*id.*; *compare Lama Holding Co. v Shearman & Sterling*, 758 F Supp 159 [1991] [not shown that financial advisor was aware of relevant tax information]). Although plaintiffs under that agreement were responsible for the final decision, there are significant allegations that CSI was obliged to impart all relevant advice and that there was a breach of that obligation.

We also reinstate the breach of fiduciary duty claims. The motion court found no fiduciary relationship existed between plaintiffs and CSI. The complaint, though, sufficiently alleges that CSI was obliged to provide investment and banking advice and other services, including negotiating upon request, so as to raise a factual issue regarding the existence of a fiduciary duty (*Frydman & Co. v Credit Suisse First Boston Corp.*, 272 AD2d 236 [2000]; *Official Comm. of Unsecured Creditors v Donaldson, Lufkin & Jenrette Sec. Corp.*, 2002 WL 362794, 2002 US Dist LEXIS 3747 [SD NY, Mar. 6, 2002), especially in view of the claim that, knowing that the GNB transaction was overpriced, and that further negotiation would increase plaintiffs' transaction costs, CSI advanced the purchase anyway in order to secure fees for itself and the Chase defendants. The complaint also adequately alleges that the other defendants knew of the fiduciary relationship between RSR/Quexco and CSI, and that they all conspired to pressure RSR/Quexco to finalize the GNB purchase for the purpose of securing additional fees from RSR/Quexco, and that if the transaction did not close, Chase and Wells Fargo would freeze RSR/Quexco's line of credit in order to place plaintiffs in a default with the banks and note holders in

order to coerce plaintiffs to renegotiate those credit terms in a manner more favorable to the creditors. These allegations sufficiently establish the claim that the remaining defendants aided and abetted CSI in its breach of fiduciary duty (*Shearson Lehman Bros. v Bagley*, 205 AD2d 467 [1994]; *Official Comm. of Unsecured Creditors, supra*).

The professional negligence claim is also adequately pleaded. The complaint also adequately states for present purposes that defendants committed acts, knowingly and without justification, that interfered with the plaintiffs' contract with third parties (*S & S Hotel Ventures Ltd. Partnership v 777 S.H. Corp.*, 108 AD2d 351 [1985]; *Goodall v Columbia Ventures*, 374 F Supp 1324, 1332 [1974]), in this case resulting in plaintiffs' breach of contract with the note holders, which damaged plaintiffs. The allegations that Chase acted fraudulently in this regard, if proved, will overcome Chase's defense of justification (*cf. E.F. Hutton Intl. Assoc. v Shearson Lehman Bros. Holdings*, 281 AD2d 362 [2001], *lv denied* 97 NY2d 603 [2001]). The disgorgement claim relates to the moneys that defendants received as interest, fees and other charges that were generated because of the breach of contract and breach of fiduciary duty, which plaintiffs allege defendants wrongfully received and which otherwise belonged to plaintiffs. Hence, although denoted a disgorgement claim, the gravamen of the claim is actually for unjust enrichment, and, in view of the liberality with which pleadings should be construed (*Friedman v Friedman*, 141 AD2d 401 [1988]), we reinstate this claim. Concur—Tom, J.P., Saxe, Sullivan, Lerner and Friedman, JJ.